THE BROWN LAW GROUP, P.C.
Rodney A. Brown, Esq. (7558)
2 Grand Central Tower
140 East 45th Street, 25th Fl.
New York, New York 10017
(212) 421-1845

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **ROBERT LEWIS ROSEN** | : | **AFFIDAVIT OF** |
| **ASSOCIATES, LTD.,** | : | **RODNEY A. BROWN** |
|  |  | **IN FURTHER SUPPORT** |
| Petitioner, | : | **OF PETITION TO VACATE** |
|  |  | **ARBITRATION AWARD** |
| -against- | : | **AND IN OPPOSITION TO** |
|  |  | **RESPONDENT'S CROSS-** |
|  | : | **MOTION FOR SANCTIONS** |
| **WILLIAM WEBB,** |  |  |
|  | : | **07 Civ. 11403** |
|  |  | **Judge Richard J. Holwell** |
| Respondent. | : |  |

-------------------------------------------------------------------x

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
|  | : ss.: |
| **COUNTY OF NEW YORK** | ) |

    **RODNEY A. BROWN**, being duly sworn, deposes and says:

    1.    I am an attorney at law, admitted to the bar of this Court and a member of the firm of The Brown Law Group, P.C., counsel for Petitioner Robert Lewis Rosen Associates, Ltd. ("Petitioner" or "RLR"). I am fully familiar with all of the facts set forth herein based on my representation of RLR in the arbitration referenced below.

    2.    This Affidavit is respectfully submitted in further support of Petitioner's

motion for an order to vacate the award issued by Arbitrator Howard Reiss on November 28, 2007 (hereinafter, the "Order") and in opposition to Respondent William Webb's (hereinafter, "Webb") Cross-Motion for Sanctions dated January 9, 2008.

3.      As previously mentioned in Par. 9 (viii) of my Affidavit in support of RLR's Petition to Vacate the Arbitration Award, on or about October 2, 2003, Webb, despite the issuance of the Final Award in the Arbitration on July 31, 2003, and notwithstanding the parties' explicit agreement to a New York arbitration forum and the application of New York law for the resolution of their disputes, filed a Petition challenging RLR's status as a licensed talent agency before the California State Labor Commissioner.  In said Petition, Webb attempted to use the California Talent Agencies Act to disgorge from RLR the monies collected from Webb pursuant to the federal court judgments confirming the Final Award.

4.      On or about November 7, 2003, when RLR sought to enjoin Webb's Petition before the California Labor Commissioner, Judge Baer stated to Webb's counsel, with respect to whether Webb's "marathon" litigation of the Final Award constituted harassing and bad-faith litigation, "you are close in my book."  See Hearing Transcript before Judge Harold Baer dated November 7, 2003 at 13 L. 23 ----14 L. 2, pertinent pages of which are annexed hereto as Exhibit ("Ex.") A.   At the same hearing, Judge Baer further stated that Webb was engaging in a pattern of activity whereby "it seems to me it is just part of the problem that I see here which is one litigation and one delaying tactic piled onto another litigation and another delaying tactic."  See Ex. A at 16 L. 1-14.

5.      Furthermore, as previously stated at Par. 9 (iv) of my Affidavit in support of RLR's Petition to Vacate the Arbitration Award, after the Final Award was confirmed, RLR sought the monies due pursuant to said Award by filing with the New York County Sheriff's

Office an income execution to garnish wages owed to Webb from its employer, MSG Network, in New York.  However, said garnishment proved ineffectual, as the percentage and rate at which RLR was to be paid would be minimal, only matching the interest that was accumulating on the Final Award, As a result, RLR sought to have the Southern District of New York's Judgment domesticated in New Jersey in January 2004.

6.    After having domesticated same in New Jersey, RLR submitted a writ of execution to the Superior Court of New Jersey, Morris County, on or about July 12, 2004, in an effort to satisfy the unpaid federal judgment out of any and all of the property of Webb including, inter alia, Webb's personal and real property.

7.    Shortly thereafter, RLR learned that Webb had engaged in a series of transactions to frustrate RLR's efforts to collect upon the New Jersey domesticated Judgment. For example, RLR learned that Webb had removed all monies from his bank accounts and transferred monies into his wife and/or adult children's bank accounts. See Cynthia Webb Dep. Tr. dated November 11, 2004 at 118 L. 8----120 L. 19, pertinent pages of which are annexed hereto as Ex. B.

8.    Webb also transferred his interest in his family's home, with a fair market value of over $1,000,000, to his wife, Cynthia, for approximately $47,000, in an effort to avoid recovery by RLR on its judgment against Webb. See Ex. B at 29 L. 22----32 L. 23 and 30 L. 2-10.

9.    During the deposition of Cynthia Webb, RLR discovered that Webb, in a transaction structured by his counsel, Jeffrey D. Ullman, was "paid" $47,000 by Cynthia Webb for his share of the Webb marital home.  RLR learned that the $47,000 "payment" was actually Webb's own money, derived directly from his income, that he deposited into Cynthia Webb's

3

bank account. This was the money that Cynthia Webb, in turn, used to "pay" Webb for his share of the Webb marital home.  See Ex. B at 37 L. 4-23.

10.     Moreover, even after the Second Circuit's Order affirming Judge Baer's determination that the November 2003 Judgment confirmed the entire Final Award, Webb was still resolute on frustrating RLR's enforcement of November 2003 Judgment.

11.     After over four (4) years of evading payment of the Final Award, Webb, in a letter dated January 30, 2007, finally sent the remaining funds that were due to RLR. However, Webb's delivery of the last check due in the amount of $98,390.21, representing the last amount due, pursuant to the "additional payment" set forth in the Final Award, was conditioned upon RLR executing a general release prior to the disbursement of the check.  Said general release would have prevented RLR from bringing an arbitration for legal fees (of which Webb, at that point, had already been apprised).   See letter from Rodney A. Brown to Jeffrey Ullman dated January 23, 2007 (without attachments) and letter from Jeffrey Ullman to Rodney A. Brown dated January 30, 2007, collectively annexed hereto as Ex. C.

12.     Neither Webb nor Mr. Ullman had any right to condition the payment of the $98,390.21 upon RLR entering into a general release, as said payment was required pursuant to the terms of three separate judicial decrees:  the November 24, 2003 Opinion and Order (and the accompanying Judgment which confirmed the entire Final Award), the June 1, 2005 Opinion and Order (accompanying the Supplemental Judgment), and the Second Circuit's Order Affirming the Supplemental Judgment.

13.     In order to remedy Webb's concerns about the remaining balance due to

RLR pursuant to the Final Award, The Brown Law Group, P.C. (hereinafter, "BLG") offered, in a letter dated February 5, 2007, to provide Webb with a limited release, evidencing clearly that the limited release would strictly except any additional claims that RLR may have.

14.    After a series of correspondence exchanged between Mr. Ullman, on Webb's behalf, and BLG, on RLR's behalf, the parties were unable to reach a compromise that was not the result of any failed negotiations between the parties but, rather, a direct consequence of Webb's absolute rejection of the concept of a limited release.  Mr. Ullman made clear that unless RLR provided Webb with a general release that prevented RLR from bringing a second arbitration for legal fees, Mr. Ullman, on Webb's behalf, would not accept the limited release.

15.    On May 30, 2007, after repeated instructions from RLR to disburse the remaining funds, BLG disbursed the $98,390.21 that BLG received from Webb to RLR, as said funds were rightfully due RLR.

16.    On July 24, 2007, Webb filed a grievance with the Departmental Disciplinary Committee, Supreme Court, Appellate Division, First Judicial Department against me and The Brown Law Group, P.C., of which I am a member.

17.    Webb's grievance alleged that I and The Brown Law Group, P.C., violated departmental ethic guidelines in distributing the $98,390.21 to RLR without conceding to Webb's extortionate demand that RLR enter into a general release.

18.    However, by letter dated November 30, 2007, the Departmental Disciplinary Committee dismissed Webb's grievance as being without merit. See letter from Departmental Disciplinary Committee to Rodney A. Brown dated November 30, 2007, a copy of which is annexed hereto as Ex. D.

19.    In his November 28, 2007 Award, Arbitrator Reiss instructed Webb to reimburse RLR the sum of $2,125.00, representing that portion of said fees in excess of the apportioned costs previously incurred by RLR during the Arbitration.

20.    Undeterred by the Disciplinary Committee's dismissal, by letter dated December 6, 2007, Mr. Ullman enclosed a check in the amount of $2,125.00 to RLR, once again conditioning disbursement of the check on the ground that counsel for RLR not distribute the $2,125.00 to RLR until RLR executed a general release in Webb's favor.  See letter from Mr. Ullman to Rodney A. Brown dated December 6, 2007 with attached check and proposed release, collectively annexed hereto as Ex. E.

21.    In response to Mr. Ullman's December 6th letter, counsel for RLR, in a letter dated December 10, 2007, rejected Webb's extortionate demand to, once again, condition disbursement of payment required pursuant to the Arbitration Award dated November 28, 2007 on RLR's execution of a release.  See letter from Rodney A. Brown to Jeffrey Ullman dated December 10, 2007, a copy of which is annexed hereto as Ex. F.

### Conclusion

22.    Accordingly, based on the reasons set forth in RLR's Moving Memorandum and accompanying Reply Memorandum of Law in further support of RLR's Petition to Vacate the Arbitration Award, it is respectfully requested that this Court vacate the award of Arbitrator Howard Reiss, and deny in its entirety Webb's Cross-Motion for Sanctions.

_____
RODNEY A. BROWN

Sworn to before me this
28th day of January, 2008

_____
Notary Public

Ryan J. Whalen
Notary Public, State of New York
No. 02WH6077567
Qualified in New York County
Commission Expires November 14, 2010

# Exhibit A

3B7HLEWC

3B7HLEWC                                                          1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  ROBERT LEWIS ROSEN ASSOCIATES,
3
4             Plaintiff,
4
5          v.                           93 Civ. 6338 (HB)
5
6  WILLIAM WEBB,
6
7             Defendant.
7
8  ------------------------------x
8
9
9                                   New York, N.Y.
10                                  November 7, 2003
10                                  11:50 a.m.
11
11 Before:
12
12              HON. HAROLD BAER, JR.
13
13                                    District Judge
14
14                    APPEARANCES
15
15 BROWN & FOX, P.C.
16      Attorneys for Plaintiff
16 RODNEY A. BROWN
17 RYAN J. WHALEN
18
18 GREENBERG TRAURIG, LLP
19      Attorneys for Defendant
19 NEIL A. CAPOBIANCO
20 BRIAN S. COUSIN
21
21
22
22
23
23
24
24
25
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

3B7HLEWC                                                          2

1       (In open court)
2       THE DEPUTY CLERK:  Robert Lewis Rosen Associates v.
3  William Webb.
4       Counsel, please state your names for the record.
5       MR. BROWN:  Rodney Brown for the petitioner, of Brown
6  & Fox, P.C.
7       MR. WHALEN:  Ryan Whalen for petitioner, Brown & Fox,
8  P.C.
9       MR. CAPOBIANCO:  Neil Capobianco for respondent,

                        Page 1

3B7HLEWC

1  THE COURT:  So what good is the forum selection
2  clause?
3       MR. CAPOBIANCO:  Your Honor, it is good for the reason
4  that they brought it.  They brought it in New York --
5       THE COURT:  Wait a minute.  I am sure they did what
6  they could do, but I mean this wasn't ex parte communication.
7  They did it with you.
8       MR. CAPOBIANCO:  Well, your Honor, we made a variety
9  of arguments in the arbitration which ultimately were rejected
10  by the arbitrator, but the point is under California public
11  policy you can't get around the proper regulations of the State
12  of California by somehow saying that some other state's law
13  applies, and they are required to submit that contract to --
14  the contract should never have been presented to Webb for
15  signature in the first place if they didn't have the approval
16  from the California labor commissioner to do so, and they acted
17  as a talent agency.
18       They dispute all of these facts, your Honor.  I have
19  no doubt they dispute these facts.  The point is that the
20  proper jurisdiction to resolve this issue is the California
21  Labor Commission.
22       THE COURT:  I just want to be clear I understand your
23  position because it is complicated, at least for me.  I gather
24  you are telling me that the forum selection clause is OK but
25  for your claim before the California Labor Commission.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3B7HLEWC                                                              12

1       MR. CAPOBIANCO:  Well, your Honor, I think that is
2  true.  I think the question is whether or not this is a
3  fundamental public policy of the State of California, and we
4  submit that it is, and that California will not allow another
5  state's law to apply if in fact you are undermining a public
6  policy of the State of California.
7       THE COURT:  So why did you sign this?  Why didn't you
8  say, listen, we'd like to do this, but the fact is we know this
9  California law where we are sitting today really won't let us?
10       MR. CAPOBIANCO:  Your Honor, there are a variety of
11  reasons why Mr. Webb --
12       THE COURT:  Just give me one.
13       MR. CAPOBIANCO:  Well, he was fraudulently induced
14  into signing it.
15       THE COURT:  He was fraudulently induced and the
16  arbitrator came out the other way?
17       MR. CAPOBIANCO:  Your Honor, he also had no counsel
18  representing him.  He didn't have the agreement before him.
19       THE COURT:  He makes 700,000 in seven months and he
20  doesn't have lawyers?
21       MR. CAPOBIANCO:  Your Honor, he looked at RLR as his
22  representative to protect his interest.
23       THE COURT:  He looked to them when he was being sued
24  or suing them?
25       MR. CAPOBIANCO:  Your Honor, this is all a very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3B7HLEWC                                                              13

1  interesting debate, but I would like to get back to the issue
2  of the injunction, which is what RLR is seeking.
3       Under Supreme Court precedent, the injunction sought
4  by RLR is precluded.  The All Writs Act only allows a federal
5  court to issue an injunction in aid of its own jurisdiction.

3B7HLEWC

6  This court's jurisdiction is not affected by what happens in
7  California.
8          This court can resolve the issue of whether or not the
9  arbitration award should be confirmed or vacated.  Those
10  motions have been submitted to your Honor and you will decide
11  them under the FAA without regard to California law, without
12  regard to what happens in the California proceeding.
13          Under Supreme Court precedent, the law is that you
14  allow parallel proceedings even if they are on the same cause
15  of action, which they are not, but even if they are on the same
16  cause of action, you allow them to go forward for reasons of
17  federalism and comity and the Anti-Injunction Act.  You don't
18  issue injunctions to state courts, you don't enter injunctions
19  against state agencies, you don't enter injunctions against
20  other federal courts.  You resolve the issue that is -- a
21  federal court resolves the issue --
22          THE COURT:  Well, you can.
23          MR. CAPOBIANCO:  You can under extreme circumstances,
24  your Honor, but the extreme circumstances in the case they cite
25  prove how narrow the exception is.  You can only do it if the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3B7HLEWC                                                         14

1  person is repeatedly harassing and acting in bad faith.
2          THE COURT:  You are close in by my book.
3          MR. CAPOBIANCO:  Your Honor, I submit not.
4          THE COURT:  I am sure of that.
5          MR. CAPOBIANCO:  Your Honor, he talks about two and a
6  half years of arbitration.  I would like to point out that we
7  have only gotten close to the merits on two claims -- their
8  claim for breach of contract and our claim for fraud in the
9  inducement.  There has been no merits proceedings on our claim
10  for faithless servant nor on any California Talent Agencies
11  Act.  There's been no proceedings on the merits.
12          THE COURT:  You just started that one.
13          MR. CAPOBIANCO:  That is true, your Honor.
14          THE COURT:  What about the other two he mentions that
15  are floating around, active litigation?
16          MR. CAPOBIANCO:  I don't know what other two he is
17  talking about.
18          THE COURT:  Like you say, let's stay with the facts
19  then.  I don't need to know about others.
20          MR. CAPOBIANCO:  This proceeding, the confirmation
21  proceeding and our proceeding for what is essentially our
22  faithless servant claim, which the arbitrator found was not
23  arbitrable, that we have in this court, and that really relates
24  to older issues, not the issues that we are now dealing with.
25          Your Honor, in the arbitration -- let me not go to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3B7HLEWC                                                         15

1  arbitration.  Let me talk about the Anti-Injunction Act,
2  because he is trying to claim that the Anti-Injunction Act
3  authorizes this injunction and it simply does not.
4          First of all, there is no injunction.  Secondly, even
5  if there was an injunction, the re-litigation exception is
6  limited to issues that are actually presented and decided by
7  the federal court.  The Talent Agencies Act under California
8  and the analogous New York claim were simply not decided by
9  this court, and in connection with the confirmation or vacation
10  under the FAA of the arbitration ruling, those issues simply

3B7HLEWC
11  will not be decided by this court.
12      Under the Supreme Court's decision in Chic Kam II, 486
13  U.S. 140, a 1988 decision of the Supreme Court, the strict and
14  narrow exception, litigation exception applies only to claims
15  or issues which have actually been decided by the federal
16  court.  So if he has a res judicata or collateral estoppel
17  argument, he has to make it in California.  It is not proper to
18  come into this court and say, please stop him from attempting
19  to assert his claims in other forums.
20      As I said, what he is offering here are defenses, and
21  those are not -- that is not a proper basis for issuing an
22  injunction from this court.
23      Younger abstention is also appropriate here.  The
24  Supreme Court has held that there is no federal equitable power
25  to enjoin state administrative agencies.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

3B7HLEWC                                                    16
1       THE COURT:  Is this the first time you have come up
2   with this in this marathon litigation, this Younger exception?
3       MR. CAPOBIANCO:  Your Honor, it is the first time we
4   have had to assert it because it is the first time he is
5   claiming that a state court agency should be enjoined.
6       THE COURT:  We are talking about as a further basis to
7   deny the injunction.  You understood that earlier on because
8   you provided papers without that in it.
9       MR. CAPOBIANCO:  It is in our papers, your Honor.
10      THE COURT:  It is now.  But in fact, it seems to me
11  that it is a late entry.  It really doesn't make any difference
12  except it seems to me it is just part of the problem that I see
13  here which is one litigation and one delaying tactic piled onto
14  another litigation and another delaying tactic.
15      I don't know what he means when he says 1986, although
16  I have been hearing about this case I feel like from 1986
17  myself.  I realize this is not what we are here about today for
18  the moment, but could you just give me the outlines of the
19  chronology of this litigation, just for my own benefit.
20      MR. CAPOBIANCO:  Sure, your Honor.  What happened is
21  that RLR commenced an arbitration in about April of 2001.  We
22  answered and asserted counterclaims in that arbitration.  RLR
23  raised objections to what the arbitrator ultimately decided,
24  that he did not have jurisdiction for six of our seven
25  counterclaims, taking jurisdiction only of the fraudulent
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

3B7HLEWC                                                    17
1   inducement counterclaim.  We brought a federal lawsuit to
2   assert our claims, because at the time we had statute of
3   limitations concerns and we were worried that the arbitrator
4   was going to ultimately find that he didn't have jurisdiction,
5   something he ultimately did.  So that litigation was basically
6   stayed pending the arbitration.  It was ultimately dismissed
7   without prejudice.  It was refiled in abbreviated form in the
8   summer of this year.  Then after the arbitration award came
9   out, then RLR moved to confirm.  Then in early October we filed
10  a petition with the California Commission.
11      THE COURT:  So it is really just a two-year-old
12  operation.
13      MR. CAPOBIANCO:  Your Honor, the point is we have not
14  had resolution on the merits of our claims except for the
15  fraudulent inducement claim.  We have not had resolution of our
                        Page 8

Exhibit B

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
MORRIS COUNTY
DOCKET NO. MRS-C-109-04

ROBERT LEWIS ROSEN
ASSOCIATES, LTD,    :

    Plaintiff,    :

    - vs -    :   DEPOSITION OF:

WILLIAM WEBB and CYNTHIA    :   CYNTHIA WEBB
WEBB, husband and wife,    :

    Defendants.    :
----------------------------

November 11, 2004
Morristown, New Jersey

B E F O R E :

    CATHY MC MAHON, Certified Shorthand Reporter and
Notary Public of the State of New Jersey, at the
offices of ULLMAN, FURHMAN & PLATT, P.C.,
89 Headquarters Plaza, Morristown, New Jersey, on
Thursday, November 11, 2004, commencing at 10:10 a.m.,
pursuant to Notice.

DIANE C. JOHNSON
Certified Shorthand Reporters
318 Sunset Boulevard
Wyckoff, New Jersey 07481
(201) 848-1945

A P P E A R A N C E S :

    TOPKINS, MC GUIRE, WACHENFELD & BARRY, LLP
    Four Gateway Center
    100 Mulberry Street
    Newark, New Jersey 07102
    (973) 622-3000
    BY:  WILLIAM C. SANDELANDS, ESQ.
    Attorney for Plaintiff

    ULLMAN, FURMAN & PLATT, P.C.
    89 Headquarters Plaza
    North Tower, Twelfth Floor
    Morristown, New Jersey 07960
    (973) 993-1744
    BY:  JEFFREY D. ULLMAN, ESQ.
    Attorney for Defendants

I N D E X

| WITNESS | DIRECT | CROSS |
|---|---|---|
| CYNTHIA WEBB | | |
| BY:  MR. SANDELANDS | 7 | |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| P-36  ID | Deed | 31 |
| P-10  ID | Two-page document | 39 |
| P-1  ID | FleetOne Gold Bank Statement dated 12/27/01 through 1/25/02 | 42 |
| P-2  ID | FleetOne Gold Bank Statement dated 2/26/02 through 3/25/02 | 45 |
| P-3  ID | FleetOne Gold Bank Statement dated 5/25/02 through 6/25/02 | 47 |
| P-4  ID | FleetOne Gold Bank Statement dated 9/26/02 through 10/25/02 | 49 |
| P-5  ID | FleetOne Gold Bank Statement dated 11/26/02 through 12/24/02 | 54 |
| P-6  ID | FleetOne Gold Bank Statement dated 12/25/02 through 1/27/03 | 57 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| P-7  ID | FleetOne Gold Bank Statement dated 1/28/03 through 2/25/03 | 59 |
| P-8  ID | FleetOne Gold Bank Statement dated 2/26/03 through 3/25/03 | 64 |
| P-9  ID | FleetOne Gold Bank Statement dated 8/26/03 through 9/24/03 | 67 |
| P-11  ID | FleetOne Gold Bank Statement dated 9/25/03 through 10/27/03 | 75 |
| P-12  ID | FleetOne Gold Bank Statement dated 10/28/03 through 11/24/03 | 78 |
| P-13  ID | FleetOne Gold Bank Statement dated 11/25/03 through 12/24/03 | 82 |
| P-14  ID | FleetOne Gold Bank Statement dated 12/25/03 through 1/27/04 | 87 |
| P-15  ID | FleetOne Classic Bank Statement dated 10/11/02 through 10/15/02 | 95 |
| P-16  ID | FleetOne Classic Bank Statement dated 10/16/02 through 11/13/02 | 98 |
| P-17  ID | FleetOne Classic Bank Statement dated 11/14/02 through 12/12/02 | 99 |
| P-18  ID | FleetOne Classic Bank Statement dated 12/13/02 through 1/14/03 | 100 |

Deposition of CYNTHIA WEBB taken on November 11, 2004

| Webb - Direct | 29 |
|---|---|

```
 1         A    Yeah.  Yes.
 2         Q    How many and where?
 3         A    It's at the same bank that we go to.
 4         Q    That's Fleet Bank, I guess now known
 5  as Bank of America?
 6         A    Yeah.  That's what I was trying to
 7  think, what the name of it is now.
 8         I believe two.
 9         Q    Do you hold a joint bank account with
10  your son Matthew?
11         A    Yes.
12         Q    How many and where?
13         A    Same bank, and I believe it's one.
14         Q    Do you hold any joint accounts with
15  your daughter Erin?
16         A    No.
17         Q    Do you have any joint accounts with
18  your husband William?
19         A    Yes.
20         Q    How many and where?
21         A    Same bank, and I believe it's two.
22         Q    I asked you earlier who was the owner
23  of 47 Cobb Road, and you had indicated that you
24  were.  Was that property at one time held by both
25  you and your husband?
```

| Webb - Direct | 30 |
|---|---|

```
 1         A    Yes.
 2         Q    Why was the property conveyed from you
 3  and your husband to you?
 4         A    Well, to make it easier if something
 5  happened to him down the road, that the house would
 6  be in my name.
 7         Q    Was the conveyance done in an effort
 8  to avoid recovery by RLR on its judgment against
 9  your husband?
10         A    Yes, partly.
11         Q    Which law firm did you utilize, you
12  and your husband utilize, to assist you in the
13  conveyance of the property from your husband and
14  you to you?
15         A    This law firm.
16         Q    Was there any other lawyer involved in
17  that transaction other than lawyers from this law
18  firm?
19         A    Not to my knowledge.
20         Q    So this law firm, as far as you
21  understand, it represented your husband in his sale
22  of his interest to you and represented you in your
23  purchase of that interest from your husband?
24         A    Yes.
25         Q    How did the decision to have your
```

| Webb - Direct | 31 |
|---|---|

```
 1  husband's interest in the property conveyed to you
 2  come about?
 3         A    Through recommendation of a lawyer.
 4         Q    This law firm?
 5         A    Um-hum.
 6         Q    "This law firm" meaning Jeffrey
 7  Ullman's law firm?
 8         A    Yes.
 9         Q    Do you know when that recommendation
10  was made?
11         A    The exact date?  No.
12         Q    Was that recommendation part of their
13  estate planning work for you and your husband?
14         A    Yes.
15         Q    Do you know which attorney at the
16  Ullman law firm made the recommendation?
17         A    Yes.
18         Q    Which one?
19         A    Art Furhman.
20         MR. SANDELANDS:  Let's mark this P-36.
21         (A Deed is received and marked P-36
22  for identification by the reporter.)
23         Q    Ms. Webb, one of the instructions I
24  forgot to give you is obviously if you need to take
25  a break at any time, do not hesitate to let me
```

| Webb - Direct | 32 |
|---|---|

```
 1  know, and I'd be happy to take a break for you.
 2  The only caveat with that is if there's a question
 3  pending, you would need to answer the question
 4  before you take a break.
 5         A    Okay.
 6         Q    I'm going to show you a document we
 7  have marked P-36 for identification, and my first
 8  question is do you recognize that document?
 9         A    Yes, I believe I have this.
10         Q    Does that document appear to be a copy
11  of the deed wherein your husband William Webb
12  conveys or at least purportedly conveys his
13  interest in 47 Cobb Road to you?
14         A    Um-hum.
15         Q    And that document shows a
16  consideration, does it not, of $47,660?
17         A    Um-hum.
18         MR. SANDELANDS:  Did I get the number
19  right?
20         MR. ULLMAN:  No, you didn't, $47,667.
21         Q    Just so we're clear with the record,
22  that deed shows a consideration of $47,667?
23         A    Yes.
24         Q    How was that amount of $47,667
25  figured?
```

Webb - Direct                                                    37

1    Q    And you relied on your counsel in
2  making that payment for that interest?
3    A    Yes.
4    Q    Where did the $47,667 come from to pay
5  your husband?
6    A    From one of our accounts.
7    Q    And when you say one of your accounts,
8  one of your accounts with your husband, correct?
9    A    I'm not sure -- no, I believe it was
10 an account that was in my name.
11   Q    The account that was in your name,
12 where did the money come from that you put in the
13 account that got paid to your husband for that
14 interest?
15   A    Money that I use to pay bills or
16 whatever comes up.
17   Q    Right; and that money that you use to
18 pay bills or whatever comes up, where does the
19 money come from?  How do you get the money in the
20 first place?
21   A    It gets deposited in the account.
22   Q    From where?
23   A    From my husband's employer.
24   Q    So stated -- bringing that full
25 circle, the money that was used to pay your husband

Webb - Direct                                                    38

1  for his interest in the property is money that
2  originally came from payment by his employer to
3  him?
4        MR. ULLMAN:  I'm going to object to
5  the form of the question.
6        Are you asking the specific dollar that came
7  to this account came from his -- is that the
8  question?
9    Q    Do you understand the question?
10   A    Well, vaguely.
11       I mean how do you separate -- he may earn
12 the money, but how do you separate what's his and
13 what's mine?
14   Q    The money that was used to pay that
15 interest in that property isn't money that you
16 earned separate from what money your husband
17 earned, correct?
18   A    How could I, if I don't have a job
19 outside the house?
20   Q    So stated simply, it was his money
21 that you used to pay him for that his interest?
22       MR. ULLMAN:  Objection, counsel.  It's
23 your conclusion.  She's not bound to accept your
24 conclusion.
25   Q    Can you answer the question?

Webb - Direct                                                    39

1    A    As I said, how do I know what's his
2  money and what's my money?  He earns the money.  I
3  pay the bills.
4    Q    Do you know where your husband
5  deposited the $47,667 once it was paid to him?
6    A    Off the top of my head, no, I don't
7  know.  I don't remember what we did.
8    Q    Do you know whether -- strike that.
9  We'll get there.
10       MR. SANDELANDS:  I would like to mark
11 this P-10.
12       (A two-page document is received P-10
13       and marked for identification by the
14       reporter.)
15   Q    Ms. Webb, I'm going to show you a
16 two-page document which has been marked P-10 for
17 identification.
18       The first page of P-10, there's a photocopy
19 of two different documents there.  Is that top
20 document the check that you wrote to your husband
21 for his interest in 47 Cobb Road?
22   A    Yes, it is.
23   Q    And that's coming out of a Fleet Bank
24 account?
25   A    Yes.

Webb - Direct                                                    40

1    Q    Okay.  Is the second document on that
2  same page a deposit slip for a joint account at
3  Fleet Bank held by you and your husband?
4    A    Yes.
5    Q    Is the handwriting on there of the
6  date and the amount, is that your handwriting?
7    A    Which one?
8    Q    On the bottom document.
9    A    No.
10   Q    Whose handwriting is that?
11   A    I believe it's my husband's.
12   Q    I'd like you to look at the second
13 page of this document.
14       Again, focusing on the top document, is that
15 your husband's signature there on the left-hand
16 side?
17   A    I don't see a signature on the -- on
18 this one (indicating)?
19   Q    No, on the other check, the top right.
20   A    Looks like him.
21   Q    Do you recognize the account number
22 that's underneath that signature?
23   A    I know it's one of our accounts.
24   Q    Is that a joint account held by you
25 and your husband?

Deposition of CYNTHIA WEBB taken on November 11, 2004

Webb - Direct   117

1  checking account, in your own name in September of
2  2002 and depositing roughly $111,000 in it?
3      A   I know I opened an account. I don't
4  remember the exact amount.
5      Q   Why did you open this account?
6      A   For the same reason as before. With
7  my husband being in a high-risk travel and where he
8  works, to have it in my name if something happened
9  to him that I could continue paying bills.
10      Q   Was it your understanding at the time
11  you did that that if it was a joint account in both
12  of your names, you wouldn't be able to continue to
13  use the account afterwards to pay bills?
14      MR. ULLMAN: Counsel --
15      MR. SANDELANDS: I'm asking for her
16  understanding, Jeff.
17      MR. ULLMAN: You've asked that
18  question before.
19      MR. SANDELANDS: No, I have not.
20      MR. ULLMAN: Yes, you did. Yes, you
21  did.
22      We went through this once before with
23  respect to a different transfer into a different
24  account.
25      I'll let her answer it one more time, but

Webb - Direct   118

1  that's it.
2      A   Say it again, please.
3      Q   Sure. Is it your understanding that
4  if it was a joint account with your husband, your
5  husband were to pass away, you cannot write checks
6  on that account after he passed away?
7      A   Yes.
8      Q   The $111,690.65 that's reflected as
9  the initial deposit in this account in your name
10  only, did that come from a joint account of you and
11  your husband?
12      A   I don't remember.
13      Q   I'd like you to take a look at Fleet
14  Gold money market account which has been marked P-4
15  for identification, and in particular the account
16  number that ends with the digits 7056, and ask you
17  to take a look at that and see if that refreshes
18  your memory as to whether or not that 111,000 came
19  from a joint account with your husband?
20      A   It could have.
21      Q   So looking at that document doesn't
22  refresh your recollection. You still say it could
23  have?
24      A   Yes.
25      Q   But you're not sure, not certain?

Webb - Direct   119

1      A   Again, I don't know the account
2  numbers.
3      Q   Also, according to P-4, Exhibit P-4,
4  on September 30, 2002, you withdrew in what's
5  called an MMS withdrawal $111,690.65.
6      According to P-22, on September 30 of 2002,
7  there is a deposit of that exact same amount in
8  your account that you hold in your own name.
9      A   Um-hum.
10      MR. ULLMAN: I'm going to object.
11      I'm sorry, you didn't finish your question.
12  Finish your question.
13      Q   Is the 111,000 in P-4 the money that
14  went into P-22?
15      MR. ULLMAN: I'm going to object to
16  the form of the question.
17      In the first place, your question assumes
18  that she -- you said the statement shows that she,
19  that is, Mrs. Webb, withdrew the money. The
20  statement doesn't show that. The statement shows
21  that the money was withdrawn. The other statement
22  shows that the money was deposited. That's what
23  the statements show.
24      You want to ask your question based on that,
25  go ahead. Otherwise, you built in an assumption

Webb - Direct   120

1  that isn't warranted by what you placed before the
2  witness.
3      MR. SANDELANDS: Let me rephrase it.
4      Q   Did you withdraw $111,690.65 out of
5  the account reflected in P-4 on September 30, 2002?
6      A   And that's this account (indicating)?
7      Q   Correct.
8      MR. ULLMAN: "This account" meaning
9  the one shown in --
10      MR. SANDELANDS: P-4, the money market
11  account, which is a joint account with her and her
12  husband.
13      A   Yes, I believe I did.
14      Q   Okay. And then did you take that
15  money that you withdrew from that joint account
16  with your husband and deposit it in or use it, more
17  precisely, to open an account in your own name,
18  which is the account reflected in P-22?
19      A   Yes, I did.
20      Q   On P-22 going down to October 11 of
21  2002, there is a check paid, number 93, in the
22  amount of $20,857.73.
23      What was that for?
24      A   I don't remember.
25      Q   Just above that check, October 9 of

Exhibit C

# THE BROWN LAW GROUP, P.C.
### ATTORNEYS AT LAW
TWO GRAND CENTRAL TOWER
140 EAST 45TH STREET
NEW YORK, NEW YORK 10017

RODNEY A. BROWN
_____
MELISSA ALCANTARA
SUDAKSHINA SEN
RYAN J. WHALEN

TEL (212) 421-1845
FAX (212) 421-8418
EMAIL: INFO@BLG-PC.COM

January 23, 2007

**BY FACSIMILE (973) 993-1748**

Jeffrey D. Ullman, Esq.                    **WITHOUT PREJUDICE**
Ullman, Furhman, Broeman & Platt, P.C.
89 Headquarters Plaza
North Tower, 12th Floor
Morristown, NJ 07960

Re:    **RLR Associates, Ltd. v. Webb 03 Civ. 6338(HB)**

Dear Mr. Ullman:

Enclosed is our calculation of the total amount owed RLR pursuant to the Supplemental Judgment in question.

Furthermore, please be advised that it is RLR's intention to commence shortly an arbitration proceeding seeking recovery of the legal fees incurred in connection with all of the various disputes between RLR and Webb arising out of their Agreement. We believe it was clearly the intention of the Arbitrator to award Claimant, RLR Associates, its attorney's fees, including, but not limited to, the attorney's fees expended in attempting to enforce the Arbitrator's Award. Unfortunately, an extraordinary amount of unwarranted litigation has taken place, including, but not limited to, Mr. Webb's bad faith efforts to evade the Judgment, Supplemental Judgment and Domesticated New Jersey Judgment, for which you, obviously, are well aware.

Very truly yours,

Rodney A. Brown

RAB: jw
Encl.

cc:    William Sandelands, Esq. (By Facsimile)

# ULLMAN, FURHMAN & PLATT, P.C.

JEFFREY D. ULLMAN*
ARTHUR N. FURHMAN, LL.M.*
GARY R. PLATT°

——
*MEMBER, N.J. AND N.Y. BAR
°NEW JERSEY BAR ONLY

ATTORNEYS AT LAW
89 HEADQUARTERS PLAZA
NORTH TOWER, TWELFTH FLOOR
MORRISTOWN, NEW JERSEY 07960-3959

TELEPHONE: (973) 993-1744
FACSIMILE: (973) 993-1748
E-MAIL: [Last Name]@ufplaw.com
INTERNET: www.ufplaw.com

January 30, 2007

VIA FEDERAL EXPRESS OVERNIGHT
Rodney A. Brown, Esq.
Brown Law Group, P.C.
Two Grand Central Tower
140 East 45th Street
New York, New York 10017

     Re:   *Robert L. Rosen Associates, Ltd. v. Webb*

Dear Mr. Brown:

     We enclose herewith a check drawn on the account of Cynthia Webb and payable to the order of your trust account in the sum of $98,390.21. Simultaneously herewith, you will be receiving a separate check from the bond carrier in the sum of $120,131.37, also via Federal Express Overnight. The total of these sums, $218,521.58 is tendered in full payment of the current "Supplemental Judgment," entered in the Southern District on June 30, 2005, and in full payment of the remaining balance owed on the "Fox Renewal," pursuant to the arbitrator's award, as calculated in your letter to us dated January 23, 2007, and as adjusted for credits due Mr. Webb by reason of the garnishment of his wages from Madison Square Garden, LLP, in January, 2005, all as set forth in my letter to you dated January 29, 2007.

     As far as we are concerned, this will close the matter. We ask that you file forthwith a satisfaction piece with the Clerk of the Southern District, and that you provide us with a copy thereof. We also ask that your client execute the enclosed release of all claims due under the arbitrator's award, in this matter, as set forth in our letter to you dated January 29, 2007. *Please take notice that you are not authorized to disburse the enclosed funds, or the funds received from the carrier, from the escrow of your trust account, unless and until you have filed the satisfaction and provided the release herein demanded.*

     Thank you for your cooperation.

Very truly yours,

ULLMAN, FURHMAN & PLATT, P.C.

By: _____

Jeffrey D. Ullman
A Member of the Firm

cc:    Bill Webb

Exhibit D

DEPARTMENTAL DISCIPLINARY COMMITTEE

SUPREME COURT, APPELLATE DIVISION

FIRST JUDICIAL DEPARTMENT

61 BROADWAY

NEW YORK, N.Y. 10006

(212) 401-0800

FAX: (212) 401-0810

PAUL J. CURRAN, ESQ.
CHAIRMAN

HALIBURTON FALES, 2D., ESQ.
MARTIN R. GOLD, ESQ.
WILLIAM FRANCIS KUNTZ, II, ESQ.
ROY L. REARDON, ESQ.
STEPHEN L. WEINER, ESQ.
SPECIAL COUNSEL

EUGENE F. BANNIGAN, ESQ.
DR. JANE EISNER BRAM
DOUGLAS W. BRANDRUP, ESQ.
CHRISTOPHER E. CHANG, ESQ.
ANN J. CHARTERS
LISA D. CORRELL
DENIS F. CRONIN, ESQ.
CHERYL DAVIS, ESQ.
JEAN E. DAVIS
TELESFORD DEL VALLE JR., ESQ.
PAUL F. DOYLE, ESQ.
PATRICIA FARREN, ESQ.
STEVEN N. FEINMAN, ESQ.
CHARLOTTE MOSES FISCHMAN, ESQ.
THOMAS FITZPATRICK, ESQ.
WILLIAM L. FREEMAN
WILLIAM A. GALLINA, ESQ.
PAUL G. GARDEPHE, ESQ.
JOSEPH STEVEN GENOVA, ESQ.
ALFRED G. GEROSA
ROBERT L. HAIG, ESQ.
WILLIAM E. HAMMOND, ESQ.
PATRICIA HANDAL
PATRICIA HATRY, ESQ.
PATRICIA M. HYNES, ESQ.
SUSAN M. KARTEN, ESQ.
STEPHEN E. KAUFMAN, ESQ.
JOHN J. KENNEY, ESQ.
DAVID G. KEYKO, ESQ.
MYRON KIRSCHBAUM, ESQ.
ANDREW M. LAWLER, ESQ.
HON. ALFRED D. LERNER
FRANK J. LOVERRO, ESQ.
MARY B. MAGUIRE
CHARLES C. MARINO
DOUGLASS B. MAYNARD, ESQ.
LAWRENCE D. McGOVERN, ESQ.
HAROLD F. McGUIRE, JR., ESQ.
FITZGERALD MILLER
CHARLES G. MOERDLER, ESQ.
MATHIAS E. MONE, ESQ.
MERCEDES A. NESFIELD
LYNN K. NEUNER, ESQ.
JANE W. PARVER, ESQ.
ANTHONY M. RADICE, ESQ.
TIMOTHY G. REYNOLDS, ESQ.
MARTIN S. ROTHMAN, ESQ.
REUBEN SAMUEL, ESQ.
SAMUEL W. SEYMOUR, ESQ.
DANIEL E. SIFF, ESQ.
JOHN SIFFERT, ESQ.
MARIAN E. SILBER, ESQ.
EUGENE P. SOUTHER, ESQ.
CHRISTINE COLLINS TOMAS
JOHN L. WARDEN, ESQ.
ERIC J. WARNER, ESQ.
SUSAN WELSHER
COMMITTEE MEMBERS

SHERRY K. COHEN
FIRST DEPUTY CHIEF COUNSEL

ANDRAL N. BRATTON
DEPUTY CHIEF COUNSEL

ANGELA CHRISTMAS
NICOLE CORRADO
KEVIN P. CULLEY
JORGE DOPICO
MADY J. EDELSTEIN
JEREMY S. GARBER
NAOMI F. GOLDSTEIN
JOSEPH J. HESTER
ROBERTA N. KOLAR
JUN HWA LEE
VITALY LIPKANSKY
STEPHEN P. McGOLDRICK
KEVIN E.F. O'SULLIVAN
ORLANDO REYES
EILEEN J. SHIELDS
JUDITH N. STEIN
RAYMOND VALLEJO
STAFF COUNSEL

November 30, 2007

PERSONAL AND CONFIDENTIAL

Rodney A. Brown, Esq.
140 East 45th Street
New York, NY  10017-3144

Re: Complaint of William Webb
    Docket No. 2007.1677

Dear Mr. Brown:

    Following a careful investigation of the allegations in the complaint filed by William Webb against you, and after review by a member of the Departmental Disciplinary Committee, we have determined to take no further action and closed the file on this matter.

                              Very truly yours,

                              Sherry K. Cohen

D-PR/R  NFG

Exhibit E

# ULLMAN, FURHMAN & PLATT, P.C.

JEFFREY D. ULLMAN*
ARTHUR N. FURHMAN, LL.M.*
GARY R. PLATT°

\_\_\_\_\_

*MEMBER, N.J. AND N.Y. BAR
°NEW JERSEY BAR ONLY

ATTORNEYS AT LAW
89 HEADQUARTERS PLAZA
NORTH TOWER, TWELFTH FLOOR
MORRISTOWN, NEW JERSEY 07960-3959

TELEPHONE: (973) 993-1744
FACSIMILE: (973) 993-1748
E-MAIL: [Last Name]@ufplaw.com
INTERNET: www.ufplaw.com

December 6, 2007

<u>VIA FEDERAL EXPRESS OVERNIGHT</u>
Rodney A. Brown, Esq.
Brown Law Group, P.C.
Two Grand Central Tower
140 East 45th Street
New York, New York 10017

Re:     *Robert L. Rosen Associates, Ltd. v. Webb*

Dear Mr. Brown:

We enclose herewith our trust check payable to the order of your trust account in the sum of $2,125.00, representing reimbursement to you of one half of the fees of the American Arbitration Association in this just-concluded matter, as directed by Arbitrator Reiss. *You are directed to hold this sum in escrow, pending your client's execution and transmission to us of the enclosed release, acknowledging payment in full in this matter, and further acknowledging payment in full with respect to the Award granted in parties' prior arbitration.* **You are not authorized to release these funds to your client unless and until the release has been duly executed and transmitted to us, as herein directed.**

Thank you for your cooperation.

Very truly yours,

ULLMAN, FURHMAN & PLATT, P.C.

By: _____
Jeffrey D. Ullman
A Member of the Firm

cc:     Bill Webb
Melanie Rutherford
William Sandelands, Esq.

## TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:

**KNOW THAT** Robert Lewis Rosen Associates, Ltd., a/k/a RLR Associates, Ltd., of New York, New York ("the Releasor"), in consideration of the sums of $218,522.18, received on January 30, 2007, and $2,125.00, received on December 7, 2007, respectively, from William Webb, 47 Cobb Road, Mountain Lakes, New Jersey ("the Releasee"), hereby releases and discharges the Releasee, his heirs, executors, administrators, conservators and estate, from all actions, causes of action, suits, claims or demands, at law or in equity, and however the same may be described, which the Releasor has, or may have, or may have had, against the Releasee, individually, or collectively, jointly or severally with any other persons or persons, living or dead, arising out of or in any way connected with those certain Arbitration Awards made and dated July 31, 2003, in *"In the Matter of the Arbitration Between RLR Associates, Ltd., Claimant, and William Webb, Respondent*," Case No. 13–40–349–01, Howard C. Edelman, Esq., Arbitrator, and November 28, 2007, in*"In the Matter of the Arbitration between Robert Lewis Rosen Associates, Ltd., Claimant and William Webb, Respondent,"* Case No. 13–140–647–07, Howard R. Reiss, Esq., Arbitrator, respectively, the Releasor hereby acknowledging due receipt of payment in full as to each such Award, and that the same are and ought to be deemed paid in full, satisfied and completely discharged.

Whenever the text hereof requires, the use of gender or singular number shall include the appropriate gender or plural number.

**IN WITNESS WHEREOF,** the Releasor, for itself, its successors, trustees, administrators or assigns has executed this Release on _____, 2007.

WITNESS:

_____

Corporate Secretary

_____

Releasor, by its Prinicpal Officer

STATE OF NEW YORK, COUNTY OF NEW YORK **ss:**

**BE IT REMEMBERED,** that on this ____ day of _____, 2007, before me, the subscriber, a Notary Public of the State of New York, personally appeared _____ who, I am satisfied, is Secretary of RLR Associates, Ltd.; that the execution, as well as the making of this Release has been duly authorized by a proper resolution of the board of directors of said corporation; that deponent well knows the corporate seal of said corporation; and that the seal affixed to said Release is such corporate seal and was thereto affixed and said Release signed and delivered by the President of Releasor mentioned in the within instrument, as and for his voluntary act and deed, and as and for the voluntary act and deed of said corporation, in presence of deponent who thereupon subscribed his/her name thereto as witness.

_____

Notary Public of the State of New York

My Commission Expires _____

**ULLMAN, FURHMAN & PLATT, P.C.**
ATTORNEY TRUST ACCOUNT
89 HEADQUARTERS PLAZA
NORTH TOWER, 12TH FLOOR
MORRISTOWN, NJ 07960

FIRST MORRIS BANK & TRUST
24 NORTH PARK PLACE
MORRISTOWN, NJ 07960

55-549/212

Sub Account No.

36-075800-3

4205

CHECK # ▶     4205

| CHECK DATE | CHECK AMOUNT |
|---|---|
| 12/06/2007 | $2,125.00 |

Two thousand one hundred twenty five And 00/100 Dollars

**BROWN LAW GROUP, P.C., TRUST ACCT.**

Re:  Client:     0758003 WEBB
     Matter:     WEBB LITIGATION/ARBITRATION

Memo:     REIMBURSEMENT OF ARBITRATION FEES

⑆004205⑆ ⑈021205499⑈ 5640541⑈

Exhibit F

# THE BROWN LAW GROUP, P.C.

ATTORNEYS AT LAW

TWO GRAND CENTRAL TOWER
140 EAST 45TH STREET
NEW YORK, NEW YORK 10017

RODNEY A. BROWN

MELISSA ALCANTARA
SUDAKSHINA SEN
RYAN J. WHALEN

TEL (212) 421-1845
FAX (212) 421-8418
EMAIL: INFO@BLG-PC.COM

December 10, 2007

**BY ELECTRONIC MAIL**

Jeffrey D. Ullman, Esq.
Ullman, Furhman & Platt, P.C.
89 Headquarters Plaza
North Tower, Twelfth Floor
Morristown, New Jersey 07960

Re:  **Robert Lewis Rosen Associates, Ltd. v. Webb**

Dear Mr. Ullman:

We reject your attempt to force our client to execute a release for a payment required pursuant to the Arbitration Award dated November 28, 2007. The Arbitration Award states, in pertinent part:

> Therefore, Respondent shall reimburse Claimant the sum of $2,125.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Claimant.

Award at pp 3-4.

The Arbitration Award requires the payment of the $2,125.00; it does not award your client a release in exchange for paying same. We are prepared to send to you an acknowledgement of payment of the specific sum. However, especially in light of continuing litigation in other tribunals, this demand is particularly unfounded and out of line.

Very truly yours,

Rodney A. Brown

RAB: cz

cc:    Melanie Rutherford
       William Sandelands, Esq.